UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN ANTHONY BANKS,<br><br>　　　　Petitioner,<br><br>　v.<br><br>T. FOSS,<br><br>　　　　Respondent. | No. 1:20-cv-00008-AWI-SKO (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[TWENTY-ONE DAY OBJECTION DEADLINE]** |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is currently serving a sentence of 83 years-to-life for his conviction of first-degree murder. He has filed the instant habeas action challenging the conviction. As discussed below, the Court finds the claim to be without merit and recommends the petition be DENIED.

**I.    PROCEDURAL HISTORY**

On June 17, 2016, in Stanislaus County Superior Court, a jury found Petitioner guilty of first-degree murder (Cal. Penal Code § 187). (Doc. 1 at 1.) In addition, the jury found true the allegation that Petitioner personally and intentionally discharged a gun proximately causing death or great bodily injury (Cal. Penal Code § 12022.53(d)). (Doc. 1 at 1.) On July 15, 2016, Petitioner was sentenced to an aggregate term of 83 years to life. (Doc. 1 at 1.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On September 18, 2018, the Fifth DCA affirmed the judgment. People v. Banks, 2018

1

WL 4443816 (Cal. Ct. App. 2018).  Petitioner then filed a petition for review in the California Supreme Court.  The petition was summarily denied on March 13, 2019.  Id.

On November 18, 2019, Petitioner filed the instant federal habeas petition. (Doc. 1.) Respondent filed an answer to the petition on March 2, 2020. (Doc. 14.)  Petitioner did not file a traverse.

## II.   FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

> A mail carrier heard a pop and saw a man shout and collapse in the street. Then he watched as Banks ran up to the man and shot him twice in the head where he lay. The mail carrier could not identify Banks as the killer. Other witnesses gave police statements that incriminated Banks, including statements that Banks had a gun that day and shot the victim, but they recanted at trial.
>
> Banks's defense was an alibi. A cousin testified that Banks was in a park in the neighborhood, drinking with her and arguing with a friend, when they heard the gunshots.

Banks, 2018 WL 4443816, at *1.

## III.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will adopt the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

> B. <u>Legal Standard of Review</u>

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003); <u>Williams</u>, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>, 529 U.S. at 405-406).

In <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  <u>Cullen v. Pinholster</u>, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  <u>Harrington</u>, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings.  <u>Davis v. Woodford</u>, 384 F.3d 628, 637 (9th Cir. 2003) (citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003)).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

3

facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.  Review of Petition

The petition presents one claim for relief: Petitioner alleges the state court violated his Sixth Amendment right to a public trial by implementing a procedure of checking the identification of trial spectators. (Doc. 1.) Petitioner presented this claim on direct appeal in the state courts. In the last reasoned decision, the Fifth DCA rejected the claim as follows:

> *A. Factual background and rulings*
>
> The record indicates that there was tension and disruptiveness among spectators both in pretrial proceedings and during the trial. Friends and relatives of both the defendant and the victim attended. At the preliminary hearing, the bailiff at one point found it necessary to warn the spectators that he would exclude any spectator engaged in harassing anyone. He also felt a need to release the two groups of spectators separately for a recess. After the recess, before ruling on whether Banks would be bound over for trial, the court warned the spectators against emotional outbursts and fighting, and said any spectators who thought they could not contain themselves when he ruled should step outside.
>
> On the first day of trial, the court announced that it had been told there were "some issues that exist amongst and between the various families and friends and relatives." It said it would not tolerate any kind of misconduct and would exclude

4

anyone engaging in it. The same day, the prosecutor informed the court that at a post-preliminary hearing before a different judge two years earlier, the victim's mother had had an emotional outburst, and that judge had excluded her from all subsequent proceedings. The prosecutor asked the current judge to allow her to attend. The judge agreed, but said any inappropriate outbursts would result in exclusion of her or anyone else.

At the end of the second day of trial, the court again cautioned the spectators, this time expressing concern about people entering and exiting the courtroom too often during the proceedings, among other things. It said, "So either you are going to come in and you are going to sit and quietly listen and not make any gestures and not make any faces or you are going to be excused."

The court announced its decision to institute identification checks for spectators at the beginning of the third day of trial: "Due to my concerns with regard to potential security problems, the sheriff's office is going to be putting up a table immediately outside my courtroom to check people as they come in and have them provide identification." There also were sign-in sheets for the spectators, on which deputies collected spectators' signatures and driver's license numbers. The court further stated it had ordered the deputies not to allow people who left the courtroom to re-enter until the court took a break. Defense counsel made an objection, stating that Banks's right to a public trial was infringed by the identification requirement, because some spectators might not have identification. The objection was overruled.

There were incidents after the identity checks began. On the afternoon of the third day of trial, defense counsel informed the court that two men who identified themselves as relatives of the victim had approached him outside the courthouse, and had stood close to him and asked why he had "to go point the finger" at the victim. Counsel said he was somewhat afraid for his safety. On the morning of the fifth day of trial, the court announced to counsel that "there was some sort of a confrontation" between the two groups of spectators outside the courthouse. The police had been called. While the court and parties were discussing this incident, the prosecutor mentioned that there had been "issues with verbal confrontations in the hallway," and said he was "concerned about the ongoing palpable tension between" the two groups.

At the end of this discussion, defense counsel told the court he had learned that some people had been turned away because they lacked identification. He renewed his objection based on the public trial clause, and moved for a mistrial. The court overruled the objection and denied the motion. It stated a finding that the identification procedure was "reasonably necessary to provide security to this courtroom and to the jurors in this case based on [the court's] own observations of what has been going on."

   *B. Analysis*

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a ... public trial ...." (U.S. Const., amend. VI; see *Presley v. Georgia* (2010) 558 U.S. 209, 211-212.) The California Constitution provides a coextensive public trial right. (Cal. Const., art. I, § 15; see *People v. Woodward* (1992) 4 Cal.4th 376, 381 (*Woodward*).) If the right to a public trial is violated, the error is reversible without regard to prejudice. (*People v. Prince* (2007) 40 Cal.4th 1179, 1276.)

"Under normal conditions a public trial is one which is open to the general public at

5

all times." (*People v. Byrnes* (1948) 84 Cal.App.2d 72, 73; *People v. Frutos* (1984) 158 Cal.App.3d 979, 987.)

Before public access to a criminal trial can be denied—that is, before a trial judge can order measures that have the effect of a broad or narrow "closure" of the courtroom to the public—several requirements must be satisfied. First, it must be true that if the measures in question are not ordered, an "overriding interest" will likely be harmed. Second, the closure must be "no broader than necessary" to protect the overriding interest. Third, the trial court must consider "reasonable alternatives" to the measures under consideration. Finally, the interest being protected must be "'articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" (*Waller v. Georgia* (1984) 467 U.S. 39, 45, 48.) These specific findings must be in writing. (*Woodward*, *supra*, 4 Cal.4th at p. 383.)

In this case, the trial court did not satisfy all of these requirements. The People do not claim otherwise. Instead, they argue that the courtroom was not closed to the public by the procedures the court ordered.

The People's position is based on a small number of cases, none constituting binding authority for us, in which situations similar to the one here were considered. In *People v. England* (2000) 83 Cal.App.4th 772 (*England*), the defendant was a prisoner tried for assaulting correctional officers. (*Id*. at pp. 775-776.) The trial took place in a courtroom on the grounds of High Desert State Prison. (*Id*. at p. 776.) This courtroom satisfied requirements for public accessibility of courtrooms on prison grounds as set forth in the Standards of Judicial Administration, but visitors still had to present identification at the gate. (*Id*. at pp. 776-778.) The Court of Appeal rejected the defendant's argument that this situation violated his constitutional right to a public trial, concluding there was no closure:

> "In this case, the court did not close the trial to the public. Defendant argues only that it was more difficult for the public to attend because some people would be dissuaded from attending a proceeding held on prison grounds and some would resent having to identify themselves to prison officials to gain access to the grounds. Neither concern impacts defendant's right to a public trial." (*England, supra*, 83 Cal.App.4th at p. 778.)

The court observed that there was "no general exclusion of the public" and viewed the identification requirement as "minimal and unintrusive." (*England, supra*, 83 Cal.App.4th at p. 779.) It did not refer to the requirements set forth in *Waller*.

*England* cited *People v. Remiro* (1979) 89 Cal.App.3d 809, which was decided before *Waller*, but remains instructive. (*England, supra*, 83 Cal.App.4th at p. 779.) The defendants in *Remiro* were members of the Symbionese Liberation Army (SLA) accused of the murder and attempted murder of Oakland school officials. (*Remiro, supra*, 89 Cal.App.3d at pp. 815-817.) The sheriff's department issued an order requiring members of the public seeking admission to the trial to be photographed, fingerprinted, and searched. On the eleventh day of the 46-day trial, the trial court ordered that the fingerprinting be stopped, but upheld the rest of the order. The courthouse had received a bomb threat and the court was concerned about the possibility of violence by the SLA and by other groups supporting and opposing it. Leaflets were distributed outside the courthouse describing the defendants as prisoners of war and urging demonstrations for their release. Members of the Weather Underground, which had claimed responsibility for acts of violence, attended. The defendant attacked a prosecution witness on the witness stand as a

6

spectator urged the defendant to kill the witness. The Court of Appeal rejected the defendants' argument that the security measures violated their right to a public trial because they discouraged some members of the public from attending. It found the security measures were reasonable under the circumstances and did not effect a "wholesale exclusion of the public." (*Id*. at pp. 847-848.)

In *Williams v. State* (Ind. 1997) 690 N.E.2d 162, the defendants were members of a drug gang charged with murder after they sprayed gunfire into an apartment building. (*Id*. at pp. 165-166.) The trial court approved security procedures requiring spectators to pass through a metal detector, show identification, and sign in. The Indiana Supreme Court held that these requirements did not violate the defendants' right to a public trial. Further, it was unnecessary for the trial court to satisfy the *Waller* requirements, because its order did not amount to either a partial or a total closure of the proceedings to the public and did not "actively exclude[ ] anyone." In the justices' view, exclusion would involve "an affirmative act specifically barring some or all members of the public from attending a proceeding." The court acknowledged that the procedures rendered the trial "marginally less 'open'" because people with no identification would be excluded, but it concluded this did not affect the defendants' right to a public trial. Further, although there might have been "constructive exclusion" of those among the defendants' fellow gang members who did not want to identify themselves to law enforcement officers, the defendants' constitutional right to a public trial did not protect against such constructive exclusion. (*Williams, supra*, at pp. 167-169.) The court also opined that, although the point was not at issue in the case before it, the considerations governing the *First* Amendment rights *of the public* to attend trials were different; procedures excluding those who did not show identification would implicate these rights and would require the trial court to state a reasoned justification on the record. (*Williams, supra*, at pp. 169-170.)

Without endorsing all the reasoning in these cases, we are persuaded that they reached the right results, and that the present case is analogous to them. To the extent that the security procedures employed here deterred members of the public who simply did not want to present identification, we think they cannot be viewed as effecting any sort of exclusion or closure. We are aware of no authority supporting the view that the Sixth Amendment guarantees a trial open to an *anonymous* public. The only individuals truly excluded from the proceedings by the court's order, and not by their own choice to remain anonymous to court personnel, were those who actually did not possess any identification. But the court did not single out these individuals and they were not excluded because the court undertook to exclude some class of individuals. They were excluded as a side effect of a measure justified on independent grounds, just as, for example, people without transportation would be excluded from a trial held in a courthouse at a distance from the jurisdiction of the crime because of a change of venue. Where the exclusion arises in this manner, we hold there is no violation of the accused's right to a public trial and the requirements of *Waller* are not triggered, at least where the number of people excluded can reasonably be estimated to be marginal. We also believe this approach is generally consistent with the above cases.

Banks's constitutional claim being unfounded, the remaining question on the security measures is whether they exceeded the bounds of reason and therefore constituted an abuse of the trial court's usual discretion to control the courtroom. (See *People v. Ayala* (2000) 23 Cal.4th 225, 252-253.) Measures that do not violate the constitution could still be an abuse of discretion. Banks identifies no such abuse, however, and we perceive none.

Banks, 2018 WL 4443816, at *1-4.

The Sixth Amendment to the Constitution establishes that a criminal defendant has a right to a public trial, by an impartial jury. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...."). "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." Waller v. Georgia, 467 U.S. 39, 46 (1984) (quotations omitted). "The public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." Estes v. Texas, 381 U.S. 532, 588 (1965) (Harlan, J., concurring). The Court of Appeals for the Ninth Circuit has observed that "[t]he public and whatever press have any interest, including newspapers, freelance writers, bloggers and anyone else, ought generally to be able to see what is going on in courtrooms, including sentencing hearings." United States v. Biagon, 510 F.3d 844, 850 (9th Cir. 2007) (Kleinfeld, J., concurring). The right to a public trial entitles a criminal defendant "at the very least... to have his friends, relatives and counsel present, no matter with what offense he may be charged." United States v. Rivera, 682 F.3d 1223, 1229 (9th Cir. 2012) (quoting In re Oliver, 333 U.S. 257, 272 (1948)).

"[T]he denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom." United States v. Shryock, 342 F.3d 948, 974 (9th Cir. 2003) (quoting United States v. Al Smadi, 15 F.3d 153, 155 (10th Cir. 1994)). Thus, a defendant's right to a public trial "is only implicated by a closure of a courtroom." Id. Closure can be justified only by an overriding interest, "such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." Waller, 467 U.S. at 46. Where a trial court closes the courtroom, it must comply with the following four requirements:

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must

8

make findings adequate to support the closure.
Id. at 48 (citing Press–Enterprise Co. v. Superior Court of California, 464 U.S. 501 (1984)). Nevertheless, the Waller test applies only to "total" closures of the courtroom – i.e., where "all persons other than witnesses, court personnel, the parties and their lawyers [a]re excluded for the duration of the hearing." Rivera, 682 F.3d at 1236. The United States Supreme Court has never addressed "partial closures" of a courtroom.

In this case, the courtroom was never completely closed to the public. Rather, the trial court imposed an identification requirement. Petitioner contends that the identification requirement was equivalent to a complete courtroom closure, but the argument lacks any merit. At most, the procedure could be considered a partial closure to the extent that some members of the public could not gain entry if they did not possess identification. As pointed out by Respondent, however, no controlling Supreme Court authority addresses less-than-total closures of the courtroom. This is fatal to Petitioner's claim since the state court rejection could not have been contrary to or an unreasonable application of Supreme Court authority.[2]

## IV.     RECOMMENDATION

For the foregoing reasons, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one (21) days after being served with a copy of this Findings and Recommendation, any

---

[2] The Court recognizes that the Ninth Circuit has imposed requirements for ordering a partial trial closure; however, circuit precedent may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013). See also Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("this Court has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."); Carey v. Musladin, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding the [issue in dispute,]...the state court's decision was not contrary to or an unreasonable application of clearly established federal law"); Holley v. Yarborough, 568 F.3d 1091, 1097-98 (9th Cir. 2009) ("Circuit precedent may not serve to create established federal law on an issue the Supreme Court has not yet addressed.").

party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **May 15, 2020**                    /s/ *Sheila K. Oberto*
                                        UNITED STATES MAGISTRATE JUDGE